**IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| FINISH ROBOTICS, INC., | ) | Bankruptcy Case No. 24-21091-GLT |
|      Debtor. | ) | Chapter 7 |
| | ) | |
| | ) | |
| _____ | ) | Hearing Date & Time:  May 29, 2025 |
| | ) | at 10:00 a.m. |
| CRYSTAL H. THORNTON-ILLAR, | ) | |
| Chapter 7 Trustee of Finish Robotics | ) | |
| Inc., | ) | Response Date:  May 20, 2025 |
| | ) | |
|      Movant, | ) | |
| | ) | |
|      v. | ) | |
| ADVANCED CONSTRUCTION | ) | |
| ROBOTICS, INC.; COMMONWEALTH | ) | |
| OF PA, DEPARTMENT OF LABOR AND | ) | |
| INDUSTRY;  JOSEPH LOSINSKI, | ) | |
| AMAZON; ANDREW KUZNESKI, III; | ) | |
| BREX BANK ACCOUNT; CARNEGIE | ) | |
| MELLON UNIVERSITY; COLUMBIA | ) | |
| GAS; COMCAST; DUQUESNE LIGHT | ) | |
| COMPANY; EDWARD ENGLER; FANUC | ) | |
| AMERICA CORPORATION, FI FUND I, | ) | |
| a series of 99 Tartans, LP; FINISH | ) | |
| ROBOTICS, a series of Master Fund 500; | ) | |
| INNOVATION WORKS; LEAD PENCIL, | ) | |
| LLC; LONE OAK TECHNOLOGY, LLC; | ) | |
| MICROSOFT; PITT CREW III, LLC; | ) | |
| PRIMEPAY; QUICKBOOKS; REED | ) | |
| SMITH, LLP; RICKY HOUGHTON; | ) | |
| ROBERT MEYER III; ROBERT MEYER | ) | |
| VI; SEWICKLEY WATER AUTHORITY; | ) | |
| TANGO VC; YIBO XING, MICHAEL | ) | |
| DONOHUE; FI5 Fund I, a series of RollUp | ) | |
| Vehicles, LP; ANDREW KUZNESKI III; | ) | |
| and  ZR INVESTMENTS | ) | |
| | ) | |
|      Respondents. | ) | |

**EXHIBIT "A" TO TRUSTEE'S MOTION FOR SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF THIRD-PARTY INTERESTS, LIENS, CLAIMS, CHARGES, AND ENCUMBRANCES PURSUANT TO 11 U.S.C. § 363(b) AND APPROVAL OF BREAK-UP FEE AND EXPENSE REIMBURSEMENT**

Docusign Envelope ID: A464E944-5C60-46BC-9464-B3BB4AC2E433

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of this 28th day of April, 2025 (the "Agreement Date"), by and between PREMIER FR, LLC, a Pennsylvania limited liability company ("Purchaser") and CRYSTAL THORNTON-ILLAR the Chapter 7 Trustee, ("Trustee" or "Seller") for the bankruptcy estate of FINISH ROBOTICS, INC. ("Estate"). Finish Robotics, Inc. ("Debtor") is a debtor in a Chapter 7 bankruptcy case pending in the United States Bankruptcy Court for the Western District of Pennsylvania (the "Bankruptcy Court") captioned *In Re: Finish Robotics, Inc., Debtor,* Chapter 7, Case No. 24-21091 (the "Bankruptcy Case" ). For the purposes of this Agreement, capitalized terms used in herein shall have the meanings set forth in ARTICLE IX.

## RECITALS

WHEREAS, Debtor was in the business of robotics (the "Business");

WHEREAS, on May 3, 2024, Debtor filed a voluntary petition (the "Chapter 7 Petition") for relief under Chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court;

WHEREAS, on May 6, 2024, Trustee was appointed as the Chapter 7 trustee for the Debtor's estate;

WHEREAS, Seller wishes to sell substantially all of the Estate's interest in the Purchased Assets (as hereinafter defined);

WHEREAS, in an effort to save costs, Seller and Purchaser have elected not to file a motion to approve bidding procedures, but, subject to final approval of the Bankruptcy Court, the Seller commits to honoring the bidding procedures and protections contained herein and understands that such commitment is a material inducement for Purchaser to enter into this Agreement;

WHEREAS, Purchaser desires to purchase the Purchased Assets from Seller and Seller desires to sell, convey, assign and transfer to Purchaser the Purchased Assets, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363(b) and 363(f) and any other applicable provisions of the Bankruptcy Code; and

WHEREAS, the Purchased Assets shall be purchased by Purchaser pursuant to an order of the Bankruptcy Court approving the such sale (the "Sale Order") acceptable to Purchaser in Purchaser's sole discretion, free and clear of all Claims and Encumbrances, pursuant to Sections 105, 363(b) and 363(f) of the Bankruptcy Code, and Rule 6004of the Federal Rules of Bankruptcy Procedure, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court (together, the "Bankruptcy Rules").

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Purchaser and Seller hereby agrees as follows:

## ARTICLE I
## PURCHASE AND SALE OF THE PURCHASED ASSETS

1.1    <u>Purchase and Sale of the Purchased Assets</u>.  Pursuant to Sections 105 and 363 of the Bankruptcy Code and on the terms and subject to the conditions set forth herein, at the Closing (defined in <u>Section 3.1</u>), Seller shall sell, transfer, assign, convey and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Seller all of Seller's right, title and interest in, to and under the Purchased Assets, free and clear of all Encumbrances.  As used herein, the term "<u>Purchased Assets</u>" shall mean all of the properties, assets and rights of Debtor, tangible and intangible,  whatever kind and nature and wherever including the following (but specifically excluding the Excluded Assets):

(a)    all Intellectual Property Assets, including, without limitations, the Intellectual Property Assets listed on <u>Schedule 1.1(a)</u> (the "<u>Purchased Intellectual Property</u>");

(b)    all tangible assets of Debtor in possession or control of the Seller (the "<u>Tangible Assets</u>"), including all machinery, equipment, vehicles, trailers, and all other rolling stock, tools, dies, appliances, components, information technology, supplies, and other tangible personal property of every kind and description, including, without limitation, those listed in <u>Schedule 1.1(b)</u>;

(c)    all Inventory, work-in-process, components, samples, and other components;

(d)    all Documents used in or relating to Debtor or the Business or in respect of the Purchased Assets;

(e)    all owned and licensed (to the extent assignable) versions of all software and firmware (including software programs, objects, modules, routines, algorithms and code, in source code, object code and executable form, data files, application programming interfaces, architecture, files, records and schematics), machine readable databases and compilations, data structures and all data and collections of data and all derivative works of any such software and related specifications and documentation, including, without limitation, the software listed on <u>Schedule 1.1(e)</u>;

(f)    all Permits and all pending applications therefor used in connection with the Business, to the extent assignable under applicable Law (the "<u>Assigned Permits</u>");

(g)    all express or implied guarantees, warranties, representations, covenants, indemnities, rights, claims, counterclaims, defenses, credits, causes of action or rights of set off against third parties relating to the Purchased Assets, including rights under vendors' and manufacturers' warranties, indemnities, and guaranties;

(h)    Debtor's Bitbucket and Google Docker accounts (the "Software Accounts");

(i)    all goodwill, payment intangibles and general intangible assets and rights of Debtor; and

(j)    all other tangible and intangible assets owned and used by Debtor in the operation of the Business, including all Internet domain names, post office box numbers, telephone and facsimile numbers and other listings and numbers, if any, used in connection with the Business, the transfer of which shall be arranged by and paid for by the Purchaser.

1.2    Excluded Assets. Notwithstanding anything to the contrary in this Agreement, in no event shall Seller be deemed to sell, transfer, assign or convey, and Seller shall retain all right, title and interest to, in and under only the following assets, properties, interests and rights of Seller (collectively, the "Excluded Assets"):

(a)    all accounts receivable of Debtor (the "Accounts Receivable");

(b)    all of Debtor's cash and cash equivalents, irrespective of source;

(c)    all real property and interests in real property;

(d)    all outstanding shares of capital stock or other equity or ownership interests held by Debtor in any direct or indirect subsidiary;

(e)    all personnel files for any employees of Debtor;

(f)    all avoidance claims or causes of action under the Bankruptcy Code or applicable Law;

(g)    all rights (including any claims, rights and interest in and to any refunds for Taxes or insurance premiums);

(h)    the corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of Debtor;

(i)    all benefit plans and assets attributable thereto;

(j)    all Contracts other than those being acquired under Section 1.1 of this Agreement; and

(k)    Seller's rights under this Agreement, the Purchase Price hereunder, any agreement, certificate, instrument or other document executed and delivered by any Seller or Purchaser in connection with the transactions contemplated hereby, or any side agreement between any Seller and Purchaser entered into on or after the Agreement Date.

1.3    <u>Non-assumption of Liabilities</u>.    Purchaser shall not assume, pay, perform, discharge, accept, or be responsible for any Liabilities of the Estate of any kind whatsoever. All Liabilities of the Estate shall remain the responsibility of the Estate. The Estate shall be solely and exclusively liable for, any and all Liabilities of the Estate, including those relating to, arising out of or in connection with the operation of Business or the Purchased Assets (including the use and ownership thereof) at any time prior to the Effective Time, including, without limitations, those Liabilities set forth below:

(a)    all Liabilities of the Estate relating to or otherwise arising, whether before, on or after the Closing, out of, or in connection with, any of the Excluded Assets;

(b)    any and all Liabilities of the Estate related to any Permits that are not assigned;

(c)    any Liabilities for wages, bonuses, retention bonuses or payments, employee benefits, accrued vacation, or other accrued or vested paid time off, assessments, severance, other employment compensation or other claims of, for, from or related to any employees, or employer Taxes, including without limitation, any arising from the vesting of any equity grants upon the Closing of the transactions contemplated hereby, or unpaid amounts to any consultants of Seller accrued or arising prior to the Closing;

(d)    all warranty and return obligations, including all Liabilities and obligations to repair or replace, or to refund the sales price (or any other related expenses) for Inventory sold prior to the Effective Time;

(e)    any product Liability claims associated with products shipped by Debtor prior to the Effective Time;

(f)    any and all Liabilities for Taxes attributable to the operation of the Debtor or the Estate on or prior to the Effective Time, and any and all Liabilities (whether direct or as a result of successor liability, transferee liability, joint and several liability or contractual liability) for Taxes that are unrelated to the Purchased Assets;

(g)    any costs and expenses incurred by the Estate incident to the negotiation and preparation of this Agreement and the transactions contemplated hereby and any Liability of the Estate to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated hereby; and

(h)    any Liabilities of the Estate in respect of any federal, state, provincial, regional, foreign or local Law that might arise or have arisen on or prior to the Effective Time.

## ARTICLE II
## CONSIDERATION; PAYMENT

2.1    <u>Good Faith Deposit</u>.    Upon the execution by Purchaser and Seller of this Agreement, Purchaser will remit $7,500 by wire transfer of immediately available funds to a bank account as shall be designated in writing by Seller for receipt thereof (the "<u>Good Faith Deposit</u>"). The Good Faith Deposit will be credited against the Purchase Price (defined below) for the

Purchased Assets at the Closing. The Good Faith Deposit will be returned to Purchaser if the Closing does not occur for any reason other than a breach by Purchaser.

2.2     Purchase Price; Payment.

(a)     The aggregate consideration (collectively, the "Purchase Price") to be paid for the purchase of the Purchased Assets shall be a cash payment of $75,000 (the "Cash Payment").

(b)     On the Closing Date Purchaser shall deliver the Cash Payment less the Good Faith Deposit (the "Closing Date Payment") and any payment required to be made pursuant to any other provision hereof in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by Seller for receipt thereof.

ARTICLE III
CLOSING AND TERMINATION

3.1     Closing. Subject to the satisfaction or waiver by the appropriate party of the conditions set forth in ARTICLE VIII, the closing of the purchase and sale of the Purchased Assets (the "Closing"), and the delivery of the Closing Date Payment, shall occur as soon as practicable following the satisfaction or waiver of all conditions set forth in this Agreement (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such condition). The Closing shall take place at 10:00 A.M. Eastern Time, remotely by exchange of documents and signatures (or their electronic counterparts). Unless otherwise agreed by the Parties in writing, the Closing shall be deemed effective and all right, title and interest of Seller in the Purchased Assets to be acquired by Purchaser hereunder shall be deemed to have passed to Purchaser shall be deemed to have occurred as of 12:01 A.M. Eastern Time on the Closing Date (the "Effective Time").

3.2     Closing Deliveries by Seller. At or prior to the Closing, Seller shall deliver to Purchaser:

(a)     A duly executed bill of sale, assignment and assumption agreement substantially in the form of Exhibit A (the "Bill of Sale");

(b)     duly executed assignments of the U.S. trademark and patent registrations and applications included in the Purchased Intellectual Property, in a form suitable for recording in the U.S. Patent and Trademark Office, and general assignments of all other Purchased Intellectual Property;

(c)     all passwords and keys to and other authorizations, information and materials needed to access and control the Software Accounts to the extent available to the Seller or in the possession or control of Seller;

(d)     the Final Order entered by the Bankruptcy Court approving the sale of the Purchased Assets to the Purchaser;

(e)    all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Seller and Purchaser, as may be necessary to convey the Purchased Assets to Purchaser in a form and substance acceptable to Purchaser in Purchaser's sole discretion; and

(f)    all other certificates, agreements and other documents required by this Agreement (or as Purchaser may reasonably request) to be delivered by Seller at or prior to the Closing in connection with the transactions contemplated by this Agreement.

3.3    <u>Closing Deliveries by Purchaser</u>.  At the Closing, Purchaser shall deliver to (or at the direction of) Seller:

(a)    Closing Date Payment;

(b)    duly executed Bill of Sale; and

(c)    all other certificates, agreements and other documents required by this Agreement (or as Seller may reasonably request) to be delivered by Purchaser at or prior to the Closing in connection with the transactions contemplated by this Agreement.

3.4    <u>Termination of Agreement</u>.  This Agreement may be terminated only in accordance with this <u>Section 3.4</u>.  This Agreement may be terminated at any time prior to the Closing, as follows:

(a)    by the mutual written consent of Seller and Purchaser;

(b)    by written notice of either Seller or Purchaser, if the Closing shall not have been consummated on or prior to the seventy-fifth (75th) day after the Agreement Date (the "<u>Outside Date</u>"); provided, however, that the Outside Date may be extended with the express consent of Seller and Purchaser, for a period up to thirty (30) days to the extent that all conditions to Closing set forth in this Agreement are capable of being satisfied as of such time are; provided further, however, that a Party shall not be permitted to terminate this Agreement pursuant to this <u>Section 3.4(b)</u> if such Party is in material breach of this Agreement or is otherwise the cause of delay;

(c)    by written notice from Purchaser to Seller, if the Bankruptcy Case is dismissed;

(d)    by written notice from Purchaser to Seller, if (i) the Seller does not file a motion seeking approval of this Agreement and to sell the Purchased Assets to Purchaser within five (5) days of the Agreement Date; (ii) the Bankruptcy Court fails to enter an Order approving the Stalking Horse Protections; (iii) the Sale Order shall not have been approved by the Bankruptcy Court by the close of business on the forty-fifth (45th) day after the Agreement Date; or (iv) following its entry, the Sale Order shall fail to be in full force and effect or shall have been stayed, reversed, modified or amended in any respect without the prior written consent of Purchaser.  The right to terminate this Agreement under this <u>Section 3.4(d)</u> shall not be available to Purchaser if Purchaser's failure to fulfill any covenant or obligation under this Agreement has

6

Docusign Envelope ID: A464F944-5C60-46BC-9464-B3BB4AC2E433

been the cause of, or resulted in, the failure of such order to meet these requirements on or before such date;

(e)     by written notice from Seller to Purchaser, if Purchaser breaches or fails to perform in any respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform: (i) would give rise to the failure of a condition set forth in ARTICLE VIII, (ii) cannot be or has not been cured by the close of business on the Outside Date and (iii) has not been waived by Seller;

(f)     by written notice from Purchaser to Seller, if any Seller breaches or fails to perform in any respect any of its covenants contained in this Agreement and such breach or failure to perform: (i) would give rise to the failure of a condition set forth in ARTICLE VIII, (ii) cannot be or has not been cured by the close of business on the Outside Date or (iii) has not been waived by Purchaser;

(g)     by written notice from Purchaser to Seller, if there shall have occurred a Material Adverse Effect since the date of this Agreement that shall be continuing;

(h)     by written notice from Seller to Purchaser, if all of the conditions set forth in Sections 8.1 and 8.2 have not been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived and Purchaser fails to deliver the Purchase Price at the Closing;

(i)     by written notice from Purchaser to Seller if any of the conditions set forth in Sections 8.1 or 8.3 have not been satisfied as of the Closing Date; or

(j)     by written notice from Purchaser to Seller pursuant to Section 7.6 in the event of a Casualty.

3.5     Effect of Termination.

(a)     In the event of termination of this Agreement pursuant to Section 3.4, this Agreement shall forthwith become void and there shall be no liability on the part of any Party or any of its partners, officers, directors or shareholders, except as set forth in this Section 3.5; provided, however, that this Section 3.5 and ARTICLE X shall survive any such termination;

(b)     Seller acknowledges and agrees that Seller shall reimburse Purchaser for the Good Faith Deposit. However, if Purchaser fails to complete the sale contemplated by this Agreement because of Purchaser's fault, Seller shall retain the Good Faith Deposit as liquidated damages and shall be released from any further obligation to sell the Purchased Assets to Purchaser.

ARTICLE IV
AS-IS WHERE-IS SALE

Purchaser acknowledges that the Trustee makes no representations or warranties in connection with the sale and the Purchased Assets of any kind and expresses no opinions regarding the tax consequences of the sale, if any.

Docusign Envelope ID: A464E944-5C60-46BC-9464-B3BB4AC2E433

ARTICLE V
REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as follows as of the date hereof and as of the Closing Date:

5.1    Organization and Qualification.  Purchaser is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization.  Purchaser has all requisite power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted.

5.2    Authority.  Subject to Bankruptcy Court approval, Purchaser has the requisite power and authority to execute and deliver this Agreement and each of the Ancillary Documents to which it is a party, to perform its obligations hereunder and thereunder, to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement by Purchaser and each of the Ancillary Documents to which it is a party, the performance by Purchaser of its obligations hereunder and thereunder, the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary actions on the part of Purchaser.  This Agreement has been, and at or prior to the Closing, each of the Ancillary Documents to which it is a party will be, duly and validly executed and delivered by Purchaser.  Assuming the due authorization, execution and delivery of this Agreement and the Ancillary Documents by Seller and subject to the effectiveness of the Sale Order, this Agreement constitutes, and each Ancillary Document to which Purchaser is a party when so executed and delivered will constitute, legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with its terms.

5.3    Conflicts; Consents.

(a)    The execution, delivery and performance by Purchaser of this Agreement or any Ancillary Document to which it is a party, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby and the taking by Purchaser of any other action contemplated hereby or thereby, do not and will not contravene, violate or conflict with any term or provision of its Organizational Documents.

(b)    No consent, waiver, approval, order or authorization of, or registration, qualification, designation or filing with any Person or Governmental Body is required in connection with the execution, delivery and performance by Purchaser of this Agreement or the Ancillary Documents to which it is a party, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby, other than such filings, notices or consents, the failure of which to make or obtain would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on Purchaser's ability to perform its obligations under this Agreement and the Ancillary Documents to which it is a party or to consummate on a timely basis the transactions contemplated hereby or thereby.

8

5.4    <u>Financing</u>. Purchaser has sufficient funds in an aggregate amount necessary to pay the Purchase Price and to consummate all of the other transactions contemplated by this Agreement and the Ancillary Documents to which it is a party.

5.5    <u>Brokers</u>. Seller is not or will not become obligated to pay any fee or commission or like payment to any broker, finder or financial advisor as a result of the consummation of the transactions contemplated by this Agreement based upon any arrangement made by or on behalf of Purchaser or any of its Affiliates.

ARTICLE VI
BANKRUPTCY COURT MATTERS

6.1    <u>Competing Transaction</u>.

(a)    This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids (each a "<u>Competing Bid</u>") at the sale hearing.  From the date hereof (and any prior time) and until the completion of the sale hearing , Seller is permitted to cause its respective representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Affiliates, agents and representatives) in connection with any sale or other disposition of the Purchased Assets.  The overbid for any Competing Bid at the Sale Hearing shall be $85,000.00 (the "<u>Overbid Amount</u>"), which is $10,000 more than the Purchase Price and proceed in bid increments of at least $1,000.00.

(b)    Seller agrees that Purchaser's execution of this Agreement provides a material benefit to the bankruptcy Estate.  To the extent Purchaser is not the successful bidder at the auction and a Competing Bid is deemed by the Bankruptcy Court to be a higher and better bid, Seller shall pay to Purchaser a break-up fee of Two Thousand Five Hundred Dollars ($2,500.00) and reimburse Purchaser for its verified costs and expenses, including attorneys' fees in an amount not to exceed Two Thousand Five Hundred Dollars ($2,500.00) (the "<u>Stalking-Horse Expense Reimbursement</u>"). The Stalking-Horse Expense Reimbursement will be deemed an allowed administrative expense against Debtor's bankruptcy Estate of and immediately payable from the proceeds of· the sale to any successful competing bidder after the closing of such sale.

6.2    <u>Sale Order</u>.  This Purchase Agreement is subject to Bankruptcy Court approval. The Purchase and Seller shall agree to a form of sale order, which shall be mutually agreeable to both parties in their respective discretion.  The Sale Order shall, among other things, (i) approve, pursuant to Sections 105, 363 of the Bankruptcy Code, (A) the execution, delivery and performance by Seller of this Agreement, (B) the sale of the Purchased Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances, and (C) the performance by Seller of their respective obligations under this Agreement; and (ii) find that Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, not a successor to any Seller and grant Purchaser the protections of Section 363(m) of the Bankruptcy Code.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of demonstrating

9

that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. In the event that the Bankruptcy Court's approval of the Sale Order shall be appealed, Seller shall use reasonable efforts to defend such appeal.

## ARTICLE VII
## COVENANTS AND AGREEMENTS

7.1    Conduct of Business of Seller. During the Pre-Closing Period, except (a) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (b) as required by applicable Law, or (c) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld), Seller shall:

(i)    maintain the Purchased Assets in their current condition;

(ii)    use reasonable efforts to comply in all material respects with all applicable Laws;

(iii)    not mortgage, pledge or subject to any Encumbrance any of the Purchased Assets;

(iv)    to the extent within the Seller's possession and/or control, maintain the books, records and accounts of Debtor;

(v)    not sell, assign, license, transfer, convey, lease, surrender, relinquish or otherwise dispose of any of the Purchased Assets;

(vi)    not make or rescind any material Tax election or take any material Tax position (unless required by Law) or file any amended Tax Return or change its fiscal year or financial or Tax accounting methods, policies or practices, or settle any Tax Liability;

(vii)    not settle or compromise any claim, Liability, Action or obligation related to or in connection with Seller, the Purchased Assets, other than the payment, discharge or satisfaction of Liabilities, pursuant to an order of the Bankruptcy Court or as otherwise contemplated by this Agreement;

(viii)    not declare any dividend, pay or set aside for payment any dividend or other distribution or make any payment to any shareholder, officer or director or any Person with whom any such shareholder, officer or director has any direct or indirect relation;

(ix)    cooperate with and assist Purchaser in identifying all Permits required by Purchaser to operate the Business after the Effective Time;

(x)    not amend, waive, modify or consent to the termination of any Permit or amend, waive, modify or consent to the termination of rights of Seller;

(xi)    not enter into any lease of real or personal property or any renewals thereof; or

10

Docusign Envelope ID: A464E944-5C60-46BC-9464-B3BB4AC2E433

(xii)    enter into an agreement to do any of the foregoing.

7.2    Access to Information.  Seller agrees that, between the Agreement Date and the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with Section 3.4, and subject to all applicable confidentiality and non-solicitation agreements, Purchaser shall be entitled, through its officers, employees, legal counsel, accountants and other authorized representatives, agents and contractors ("Representatives"), to have such reasonable access to and make such reasonable investigation and examination of the books and records, properties, businesses, assets, Employees, accountants, auditors, counsel and operations of Seller as Purchaser's Representatives may reasonably request to the extent available.  Any such investigations and examinations shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances.  Seller shall use commercially reasonable efforts to cause the Debtor's Representatives to reasonably cooperate with Purchaser and Purchaser's Representatives in connection with such investigations and examinations, and Purchaser shall, and shall use its commercially reasonable efforts to cause its Representatives to, reasonably cooperate with Seller and their respective Representatives.

7.3    Reasonable Efforts; Cooperation.

(a)    Subject to the other provisions hereof, each Party shall use its commercially reasonable efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable under applicable Law to cause the transactions contemplated herein to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and shall cooperate fully with each other Party and its Representatives in connection with any step required to be taken as a part of its obligations hereunder.  Seller shall use best efforts to assist Purchaser in accessing, moving and transporting the Purchased Assets to or from Debtor's premises, which expenses shall be borne solely by Purchaser.

(b)    The obligations of Seller pursuant to this Section 7.3 shall be subject to any orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case), and each of Seller's obligations as a chapter 7 trustee to comply with any order of the Bankruptcy Court (including the Sale Order) and to seek and obtain the highest or otherwise best price for the Purchased Assets as required by the Bankruptcy Code.

7.4    Further Assurances.  Each Party shall execute and cause to be delivered to each other Party such instruments and other documents, and shall take such other actions, as such other Party may reasonably request (prior to, at or after the Closing) for the purpose of carrying out or evidencing any of the transactions contemplated by this Agreement.

7.5    Payment of Transaction Taxes and Fees; Periodic Taxes.

(a)    For purposes of this Agreement, the term "Transfer Charges" shall mean all transfer, filing, recordation, value added, goods and services, sales, use, bulk sales, excise or license taxes, stamp duties or similar fees or taxes assessed in connection with the Agreement.  Purchaser and Seller shall equally bear the Liability of all other Transfer Charges except that the

11

parties shall split any transfer taxes that are imposed. The Parties shall comply with the invoicing, payment and remittance requirements under applicable Law with respect to all Transfer Charges. Seller and Purchaser shall cooperate with each other in the provision of any information or preparation of any documentation that may be necessary or useful for obtaining any available mitigation, reduction or exemption from any Transfer Charges.

(b)     Unless the Parties mutually agree otherwise, any Tax Returns that must be filed in connection with any Transfer Charges shall be prepared and filed by the Party required by Law to file such Tax Returns.

(c)     The Parties agree that, for sales Tax purposes, the sale of the Purchased Assets under this Agreement is an occasional sale of assets by Seller in which Seller does not trade in the Ordinary Course of Business. The Parties shall take commercially reasonable actions to assert and establish the occasional sale exemption (or the comparable exemption under the Laws of the Commonwealth of Pennsylvania) from any sales Tax associated with the transactions contemplated hereby, to the extent such exemption is available. Seller, at Purchaser's expense, shall arrange for electronic delivery to Purchaser or its designated Affiliates of all Seller Intellectual Property assets at closing to the extent such delivery reduces or eliminates applicable Taxes.

(d)     Personal property taxes, ad valorem taxes, or taxes with respect to the Purchased Assets that are imposed on a periodic basis (collectively, "Periodic Taxes") shall be prorated between the Estate and Purchaser for any taxable period that includes but does not end on the Closing Date. Periodic Taxes shall be prorated between Purchaser and the Estate based on the relative periods the Purchased Assets were owned by each respective party (or its Affiliates) during the fiscal period of the taxing jurisdiction for which such taxes were imposed by such jurisdiction (as such fiscal period is or may be reflected on the bill rendered by such taxing jurisdiction). Purchaser or the Estate, as applicable, shall reconcile and pay at Closing their pro-rata share of the Periodic Taxes based on a current invoice, if available, or the last invoice from the taxing authorities.

7.6     Casualty. If, between the Execution Date and the Closing, any of the Purchased Assets shall be destroyed or damaged in whole or in part by fire, earthquake, flood, other casualty or any other cause ("Casualty"), then Purchaser shall have the option to: (a) acquire such Purchased Assets on an "as is" basis and take an assignment from Seller of any insurance proceeds payable to Sellers in respect of the Casualty; or (b) terminate this Agreement and the transactions contemplated hereby.

ARTICLE VIII
CONDITIONS TO CLOSING

8.1     Conditions Precedent to the Obligations of Purchaser and Seller. The respective obligations of each Party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by each of Seller and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)    there shall not be in effect any order, writ, injunction, judgment or decree entered by a Governmental Body of competent jurisdiction, or any Law preventing, enjoining, restraining, making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or the Ancillary Documents; and

(b)    the Bankruptcy Court shall have entered the Sale Order (as provided in ARTICLE VI) and such order shall be a Final Order and in form and substance reasonably satisfactory to Seller and Purchaser, which orders shall not have been reversed, modified, amended or stayed.

8.2    <u>Conditions Precedent to the Obligations of Seller</u>.  The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions, any of which may be waived in writing by Seller in their sole discretion:

(a)    the representations and warranties made by Purchaser in this Agreement or in any Ancillary Document shall be true and correct in all material respects (without giving effect to any materiality or similar qualification contained therein), in each case as of the Agreement Date and as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date);

(b)    Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date; and

(c)    Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in <u>Section 3.3</u>.

8.3    <u>Conditions Precedent to the Obligations of Purchaser</u>.  The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions, any of which may be waived in writing by Purchaser in its sole discretion:

(a)    Seller shall have delivered to Purchaser a true and correct copy of the Sale Order (which shall contain the terms described in <u>Section 6.2</u>); and

(b)    Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by Seller on or prior to the Closing Date; and

(c)    Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 3.2</u>;

(d)    a Sale Order, that is a Final Order, shall have been entered by the Clerk of the Bankruptcy Court or such other court on the docket in Seller's Bankruptcy Cases or the docket of such other court; and

13

(e)    Since the date of this Agreement, there has been no Material Adverse Effect.

8.4    <u>Survival</u>.  No representations, warranties, covenants and agreements of Seller and Purchaser made in this Agreement shall survive the Closing Date except for <u>Sections 1.3, 7.3(a), 7.4, , 7.5,</u> and <u>ARTICLE X</u> of this Agreement and any other section of this Agreement where, and only to the extent that, the terms of any such covenant or agreement expressly provide for the rights, duties or obligations extending after the Closing.

## ARTICLE IX
## ADDITIONAL DEFINITIONS

9.1    <u>Definitions</u>.  As used herein:

(a)    "*pdf*" shall have the meaning set forth in <u>Section 10.3(b)</u>.

(b)    "*Accounts Receivable*" shall have the meaning set forth in <u>Section 1.2(b)</u>.

(c)    "*Action*" means any action, claim, complaint, grievance, summons, suit, litigation, arbitration, mediation, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation by or before any Governmental Body.

(d)    "*Affiliate*" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(e)    "*Agreement*" shall have the meaning set forth in the preamble.

(f)    "*Agreement Date*" shall have the meaning set forth in the preamble.

(g)    "*Ancillary Documents*" means any certificate, agreement, document or other instrument (other than this Agreement) to be executed and delivered by a Party in connection with the consummation of the transactions contemplated this Agreement.

(h)    "*Assigned Permit*" shall mean any and all of Debtor's right, title and interest in, to and under any Permit that Seller sells, transfers, assigns, conveys and delivers to Purchaser, and that Purchaser purchases, acquires and accepts from Seller in connection with the Purchased Assets.

(i)    "*Bankruptcy Code*" shall have the meaning set forth in the Recitals.

(j)    "*Bankruptcy Court*" shall have the meaning set forth in the Recitals.

(k)    "*Bankruptcy Rules*" shall have the meaning set forth in the Recitals.

14

(l) *"Business"* shall have the meaning set forth in the Recitals.

(m) *"Chapter 7 Petition"* shall have the meaning set forth in the Recitals.

(n) *"Claim"* has the meaning given that term in Section 101(5) of the Bankruptcy Code.

(o) *"Closing"* shall have the meaning set forth in Section 3.1.

(p) *"Closing Date"* means the date on which the Closing occurs.

(q) *"Closing Date Payment"* shall have the meaning set forth in Section 2.2(b).

(r) *"Code"* means the United States Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, as the same may be in effect from time to time.

(s) *"Contract"* means any written or oral contract, purchase order, service order, sales order, indenture, note, bond, lease, sublease, license, understanding, instrument or other agreement, arrangement or commitment that is binding upon a Person or its property, whether express or implied.

(t) *"Debtor"* shall have the meaning set forth in the Recitals.

(u) *"Documents"* means all of Debtor's written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies and documents, Tax Returns, ledgers, journals, title policies, customer lists, vendor lists, supplier lists, sales and credit reports, regulatory filings, operating data and plans, business plans and documents related to the Business, research material, drawings, blueprints, schematics, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), PCB design files, leadframe design files/documents, documents related to masks for manufacturing, test pattern documents and software files and other similar materials, in each case whether or not in electronic form relating to Debtor, the Business or the Purchased Assets.

(v) *"Effective Time"* shall have the meaning set forth in Section 3.1.

(w) *"Employee"* means an individual who, as of the applicable date, is employed by Seller.

(x) *"Encumbrance"* means any lien (as defined in Section 101(37) of the Bankruptcy Code), encumbrance or claim (as defined in Section 101(5) of the Bankruptcy Code).

(y) *"Excluded Assets"* shall have the meaning set forth in Section 1.2.

Docusign Envelope ID: A464E944-5C60-46BC-9464-B3BB4AC2E433

(z) "*Final Order*" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction entered by the Clerk of the Bankruptcy Court or such other court on the docket in Seller's Bankruptcy Cases or the docket of such other court, which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other court of competent jurisdiction shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

(aa) "*Governmental Body*" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

(bb) "*Intellectual Property*" means all (a) intellectual property (as defined in Section 101(35A) of the Bankruptcy Code), and (b) trademarks, service marks, trade names, brand names, logos, trade dress, design rights and other similar designations of source, sponsorship, association or origin, together with the goodwill connected with the use of and symbolized by, and all registrations, applications and renewals for, any of the foregoing.

(cc) "*Intellectual Property Assets*" means all Intellectual Property that is owned by Debtor or within Debtor's control or used by Debtor.

(dd) "*Intellectual Property Registrations*" means all Intellectual Property Assets that are subject to any issuance, registration, application or other filing by, to or with any Governmental Body or authorized private registrar in any jurisdiction, including registered trademarks, domain names and copyrights, issued and reissued patents and pending applications for any of the foregoing.

(ee) "*Inventory*" means all inventory (including finished goods, supplies, raw materials, work in progress, spare, replacement and component parts) of Debtor maintained or held by, stored by or on behalf of, or in transit to, Debtor.

(ff) "*Knowledge*" or ("Knowledge of Seller" or "Seller's Knowledge") means the actual knowledge of those individuals set forth on Schedule 9.1(ff), in each case, including facts of which any such individual should be aware in the reasonably prudent exercise of his or her duties.

16

Docusign Envelope ID: A464F944-5C60-46BC-9464-B3BB4AC2E433

(gg) "**Law**" means any federal, state, local, municipal, foreign or international, multinational or other law, statute, constitution, principle of common law, resolution, ordinance, code, edict, decree, rule, regulation, ruling or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

(hh) "**Liability**" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(ii) "**Licensed Intellectual Property**" means any Intellectual Property that is licensed to Debtor, including Intellectual Property.

(jj) "**Material Adverse Effect**" means any event, change, occurrence or state of facts that has had, or is reasonably likely to have, individually or in the aggregate, a material adverse effect on the Estate, Debtor or the Business or operations thereof or on the quality or condition of the Purchased Assets. For purposes of this term, the materiality threshold shall be changes that result in lost value in an amount that exceeds $10,000 in the aggregate.

(kk) "**Ordinary Course of Business**" means the ordinary and usual course of normal day to day operations of the Business consistent with past practice prior to the Petition Date.

(ll) "**Organizational Documents**" means, with respect to a particular entity Person, (i) if a corporation, the articles or certificate of incorporation and bylaws, (ii) if a general partnership, the partnership agreement and any statement of partnership, (iii) if a limited partnership, the limited partnership agreement and certificate of limited partnership, (iv) if a limited liability company, the articles or certificate of organization or formation and any limited liability company or operating agreement, (v) if another type of Person, all other charter and similar documents adopted or filed in connection with the creation, formation or organization of the Person, and (vi) all amendments or supplements to any of the foregoing.

(mm) "**Owned Intellectual Property**" means all Intellectual Property owned by Debtor.

(nn) "**Party(ies)**" shall mean Purchaser and/or Seller, including any successors and permitted assigns of Purchaser and/or Seller.

(oo) "**Permits**" means to the fullest extent permitted under applicable Law, all notifications, licenses, permits (including environmental, construction and operation permits), franchises, certificates, approvals, consents, waivers, clearances, exemptions, classifications, registrations, variances, orders, tariffs, rate schedules and other similar documents and authorizations issued by any Governmental Body to Debtor.

(pp) "**Person**" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

(qq) "**Petition Date**" means the date on which Debtor commenced the Bankruptcy

(rr) "**Pre-Closing Period**" means the period commencing on the Agreement Date and ending on the earlier of the date upon which this Agreement is terminated pursuant to Section 3.4 or the Effective Time.

(ss) "**Sale Motion**" means the motion or motions of Seller, in form and substance reasonably acceptable to Seller and Purchaser, seeking entry of a Final Order approving this Agreement and the consummation of the transactions contemplated in this Agreement.

(tt) "**Sale Order**" shall have the meaning set forth in the Recitals.

(uu) "**Seller**" or "**Seller**" shall have the meaning set forth in the preamble.

(vv) "**Seller Intellectual Property**" means, collectively, the Intellectual Property Asset and the Licensed Intellectual Property.

(ww) "**Subsidiary**" means, with respect to any Person, any corporation, limited liability company, joint venture or partnership of which such Person (a) beneficially owns, either directly or indirectly, more than fifty percent (50%) of (i) the total combined voting power of all classes of voting securities of such entity, (ii) the total combined equity interests, or (iii) the capital or profit interests, in the case of a partnership; or (b) otherwise has the power to vote or to direct the voting of sufficient securities to elect a majority of the board of directors or similar governing body.

(xx) "**Tax**" and "**Taxes**" mean any and all taxes, charges, fees, tariffs, duties, impositions, levies or other assessments, imposed by any Governmental Body, including any interest, penalties or additional amounts attributable to, or imposed upon, or with respect to, Taxes and any Liability for the Taxes of any other Person as a transferee or successor, by Law, Contract or otherwise.

(yy) "**Tax Return**" means any return, report, information return, declaration, claim for refund or other document (including any schedule or related or supporting information) supplied or required to be supplied to any Governmental Body with respect to Taxes, including amendments thereto.

ARTICLE X
MISCELLANEOUS

10.1    <u>Payment of Expenses</u>.    Except as otherwise provided in this Agreement, and whether or not the transactions contemplated hereby are consummated, Seller and Purchaser shall bear their own expenses incurred or to be incurred in connection with the negotiation and execution of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby.

18

Docusign Envelope ID: A464E944-5C60-46BC-9464-B3BB4AC2E433

10.2    Entire Agreement; Amendments and Waivers.  This Agreement, together with the Ancillary Documents, represents the entire understanding and agreement between the Parties with respect to the subject matter hereof.  This Agreement may be amended, supplemented or changed, and any provision hereof may be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, condition, covenant or agreement contained herein.  The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by applicable Law.

10.3    Execution of Agreement; Counterparts; Electronic Signatures.

(a)    This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument, and shall become effective when counterparts have been signed by each of the Parties and delivered to the other Parties; it being understood that all Parties need not sign the same counterparts.

(b)    The exchange of copies of this Agreement and of signature pages by facsimile transmission (whether directly from one facsimile device to another by means of a dial-up connection or whether mediated by the worldwide web), by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by combination of such means, shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes.  Signatures of the Parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

10.4    Construction and Interpretation of Agreement.

(a)    Section titles or captions in this Agreement are included for purposes of convenience only and shall not be considered a part of the Agreement in construing or interpreting any of its provisions.  All references in this Agreement to Sections shall refer to Sections of this Agreement unless the context clearly otherwise requires.

(b)    When used in this Agreement, the word "including" shall have its normal common meaning and any list of items that may follow such word shall not be deemed to represent a complete list of the contents of the referent of the subject.

(c)    The Parties have participated jointly in the negotiation and drafting of this Agreement.  If any ambiguity or question of intent or interpretation arises, no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

4925-8292-3052, v. 3

(d)      Unless the context otherwise requires, when used in this Agreement, the singular shall include the plural, the plural shall include the singular and all nouns, pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, as the identity of the Person or Persons may require.

(e)      Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except as expressly provided in this Agreement.

10.5    <u>Governing Law</u>.   THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT FOR ANY LAWS OF THAT STATE WHICH WOULD RENDER SUCH CHOICE OF LAWS INEFFECTIVE), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

10.6    <u>Jurisdiction, Waiver of Jury Trial</u>.

(a)      THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

(b)      EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

10.7    <u>Notices</u>. Unless otherwise set forth herein, any notices, consents, waivers and other communications required or permitted by this Agreement shall be in writing and shall be deemed given to a Party when (a) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid), or (b) sent by facsimile or e-mail, in each case, if sent during the normal business hours of the recipient, with confirmation of transmission by the transmitting equipment confirmed with a copy delivered as provided in clause (a), in the case of each of clauses (a) and (b), to the following addresses, facsimile numbers or e-mail addresses and marked to the attention of the person (by name or title) designated below (or to such other address, facsimile number, e-mail address or person as a Party may designate by notice to the other Parties):

If to Seller, to:            Crystal H. Thornton-Illar
                            525 William Penn Place, 28th FL
                            Pittsburgh PA 15219
                            Cthornton-illar@leechtishman.com

20

With a copy (which shall constitute effective notice) to:

> John Steiner
> Leech Tishman
> 525 William Penn Place, 28th FL
> Pittsburgh PA 15219
> jsteiner @leechtishman.com

If to Purchaser, to:

> Premier FR, LLC
> 1100 Rico Road
> Monroeville, PA 15146
> Attention: Michael F. Gunniers, President
> Email: MGunniers@premierautomation.com

With a copy (which shall **not** constitute effective notice) to:

> Houston Harbaugh, PC
> 401 Liberty Avenue, 22nd Floor
> Pittsburgh, PA 15222
> Attention: Scott E. Duffy
> Email: sduffy@hh-law.com

10.8    <u>Binding Effect; Assignment</u>.

(a)    This Agreement shall be binding upon Purchaser and, subject to entry of the Sale Order, Seller, and inure to the benefit of the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case.

(b)    Except as provided below, no assignment of this Agreement or of any rights or obligations hereunder may be made by Seller or Purchaser (by operation of Law or otherwise) without the prior written consent of the other Parties and any attempted assignment without such required consents shall be void; provided, however, that Purchaser may assign its rights and interests under this Agreement to a wholly-owned subsidiary of Purchaser without the prior written consent of Seller. No party assigning any rights or interests in this Agreement shall be relieved of its obligations arising under this Agreement.

10.9    <u>Severability</u>. Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or portion of any provision in such jurisdiction and in lieu of such invalid, illegal or unenforceable provision or portion of any provision, there will be added automatically as a part of this Agreement a valid legal and

enforceable provision as similar in terms to such invalid, illegal or unenforceable provision as may be possible.

10.10 <u>Bulk Sales Laws</u>. Each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement or any Ancillary Document. Pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any and all liens (as defined in Section 101(37) of the Bankruptcy Code), claims (as defined in Section 101(5) of the Bankruptcy Code, including claims for successor liability under any theory of Law or equity), interests, or Encumbrances, in each case pursuant to Section 363(f) of the Bankruptcy Code, whether arising prior to or subsequent to the Petition Date, including any liens or claims arising out of the "bulk-transfer" Laws.

**IN WITNESS WHEREOF**, the Parties have caused this Asset Purchase Agreement to be executed by their respective duly authorized officers as of the date first above written.

PURCHASER:                                      SELLER:

PREMIER FR, LLC,                                Crystal H. Thornton-Illar, the Chapter 7
a Pennsylvania limited liability company        Trustee of FINISH ROBOTICS, INC.,

By: PREMIER AUTOMATION
      HOLDINGS, INC., its sole member

By: _Michael Gunniers (signature)_____          By: _Crystal H. Thornton-Illar (signature)__
      Michael F. Gunniers, President                  Crystal H. Thornton-Illar, Chapter 7
                                                      Trustee of Finish Robotics, Inc.

4925-8292-3052, v. 3

<u>Schedule 1.1(a)</u>

Intellectual Property Assets

Attached

# United States of America

## United States Patent and Trademark Office

# ONE COAT TO SPEC

**Reg. No. 7,281,493**

**Registered Jan. 16, 2024**

**Int. Cl.: 37, 41**

**Service Mark**

**Supplemental Register**

Finish Robotics Inc. (DELAWARE CORPORATION)
12 South Ave
Sewickley, PENNSYLVANIA 15143

CLASS 37: rental of robots for building construction; rental of robots for building maintenance; rental of robots for painting; rental of robots for installing drywall; rental of robots for power washing; rental of robots for cleaning interior and exterior building surfaces and otherwise preparing the surfaces for painting or coating; rental of robots for applying spray coatings; construction services, namely, robot-assisted drywall installation, cleaning of interior and exterior building surfaces and otherwise preparing the surfaces for painting or coating, and painting and applying coatings to building interiors and exteriors

FIRST USE 8-10-2023; IN COMMERCE 8-10-2023

CLASS 41: training services in the field of robot-assisted construction; training services in the field of robot-assisted surface cleaning and surface preparation and coating; providing training of technicians, engineers and contractors in the field of robot-assisted construction services

FIRST USE 8-10-2023; IN COMMERCE 8-10-2023

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

SER. NO. 97-468,058, FILED P.R. 06-21-2022; AM. S.R. 08-11-2023



*Katherine Kelly Vidal*

Director of the United States
Patent and Trademark Office



## Finish Robotics – Index of IP Products (prepared by Karen Sutton on 15April2024 (Rev0)

| Att. Dkt. No. | Title as filed | Appl. Type | Serial No. | Filing Date |
|---|---|---|---|---|
| 137-1 RH | Method and Assembly for Monitoring Coating Material Quantity in Containers used in Robotic Coating Applications | utility | 17/837,637 | 10-Jun-22 |
| 137-4 RH | finishbot | tm | 97353873 | 8-Apr-22 |
| 137-5 RH | finish robotics | tm | 97353885 | 8-Apr-22 |
| 137-6 RH | one coat to spec | tm R | | |
| 137-7 RH | finishbot autonomous coating system | tm | 97468033 | 21-Jun-22 |
| 137-8 RH | fully and semi-autonomous sheet hanging robotic platform system/method | utility | 18/483,559 | 10-Oct-23 |
| 137-10 RH | semi-autonomous mobile robotic laser ablation system and method | ppa | 63/585,099 | 25-Sep-23 |
| 137-11 RH | copyright/s | c | na | TBD |
| | | | | |
| | | | | |

Abbreviations:

tm      trademark
ppa     provisional patent application
c       copyright

Schedule 1.1(b)

Tangible Assets

Multiple Screw, bolts, nuts (new - unboxed)
Bunch, multiple misc wiring terminals (new - unboxed)
Misc. Electronic sensors
(2) Precision Laser sensors
Graco 395 Airless Sprayer
Graco 650 PC PRO Airless Sprayer
(2) Small air compressor
(2) Short air compressor hoses
Bunch, multiple connectors, fittings
Graco Cordless Handheld Sprayer
Batch (multiple) spools or loose cable (without connectors)
Batch (multiple) connectors
Custom Linear ball screw rail
Rivnut hand tools
Tool box with misc tools on wheels
Cart with holder for bins
Box of misc fanuc cables/connectors
Box of misc painting supplies, tape, tarps, etc.
Portable Lowes tool box on wheels with 3 compartments
(20) Misc. collection of graco paint tips
Box lighted switches
ATI Air actuated industrial arm sander: Model # 9150-aov-01
Box plastic enclosures and wire harnesses
Set of drywall mudding tools
24 VDC to 120 VAC inverter
Custom linear belt drive rail with gearing

**Office Furniture:**
Wide shelf TV display
40ft shipping container
(5) Small off brand self raising desks
(2) Medium off brand self raising desks
(9) Office chairs
(3) LG 1920x1080 monitors
55 inch LG TV
50 inch Samsung TV
(5) Small wheeled filing cabinets
4K 43 inch Samsung TV (un43nu)
White board on wheels
Small standing desk on wheels
Office coffee maker (large drip commercial)
Metal storage box (small)
Conference table and (8) chairs (low quality)

Docusign Envelope ID: A464E941-5C60-46BC-9464-B3BB4AC2E433

Loveseat / chair / coffee table (low quality)

**Office fixtures, office equipment, including all computer equipment and communication systems equipment and software**
(6) Intel Realsense L515
Nvidia Jetson AGX
(4) Dell laptops
Intel server for software builds
Embedded network switches
Conference USB speaker/camera
Bunch misc extension cords
Bunch / box misc USB cables
Bunch / box keyboard / mice
(3) Dell UBS hubs
Shop vac
(5) Jetson Nano computers
(8) Intel RealSense Devices

**Watercraft, trailers, motor vehicles, and related accessories**
8.5x16 Discovery ET - dual axle pull behind enclosed trailer
7-meter linear rail (with stands) no sled, no gear box

**Other machinery, fixtures, and equipment**
DeWalt 20V MAX Cordless Drywall Sander
DeWalt 20V hand sander
DeWalt 20v drill
(4) DeWalt 20V batteries
Decommissioned Genie 4046
Decommissioned Genie 1932
2 CRX Fanuc industrial arms, with linear rails, motors and drivers
Graco automation spray head
24 VDC to 120 VAC inverter
Decommissioned Genie 1330m
(2) Shock vibe sensors – used

<u>Schedule 1.1(e)</u>

Software

Build system
C++ robotic system control software
Python command/control software
C# UI source code
Karel code for Fanuc

Exhibit A

BILL OF SALE

RECITALS

WHEREAS, Finish Robotics, Inc. ("Debtor"), filed a voluntary petition for relief under Title 7 of the United States Code on May 3, 2024, commencing a bankruptcy case in the United States Bankruptcy Court for the Western District of Pennsylvania (the "Bankruptcy Court") at Bankruptcy Case No. 24-21091 (the "Bankruptcy Case");

WHEREAS, Crystal Thornton-Illar was appointed as Chapter 7 Trustee ("Trustee" or "Grantor") for the bankruptcy estate of Debtor;

WHEREAS, Trustee and Premier FR, LLC ("Grantee") entered into that certain Asset Purchase Agreement dated [•] [•], 2025 (the "APA"), whereby Trustee agreed to sell and assign substantially all of the Debtor's assets to Grantee, free and clear of all liens, claims, interests and encumbrances; and

WHEREAS, on [•] [•], 2025, the Bankruptcy Court entered an Order in the Bankruptcy Case approving the sale and assignment of substantially all of the Debtor's assets to Grantee, free and clear of all liens, claims, interests and encumbrances (the "Sale Order").

NOW, THEREFORE WITNESSETH, FOR GOOD AND VALUABLE CONSIDERATION RECEIVED, Grantor hereby grants, bargains, sells, transfers and delivers to Grantee, subject to the terms and conditions of the Sale Order and the APA, all of the Seller's right, title and interest in and to the Purchased Assets (as such term is defined in the APA), free and clear of all Encumbrances (as such term is defined in the APA). Capitalized terms not otherwise defined herein shall have the meaning given to them in the APA. Except as provided for in the APA and herein, this conveyance and assignment is made without recourse, warranty or representation. The recitals set forth above are incorporated by reference as if fully set forth at length herein.

This conveyance and assignment shall inure to the benefit of, and bind, as the case may be, the parties hereto and their respective legal representatives, successors and assigns.

This conveyance and assignment may be executed in counterparts, each of which shall be deemed an original and all of which shall together constitute one and the same instrument. Electronically transmitted copies of executed signature pages of this conveyance and assignment shall have the same force and effect as the originals.

EXECUTED to be effective as of [●] [●], 2025.

GRANTEE:                                              GRANTOR:

PREMIER FR, LLC,                                     Crystal H. Thornton-Illar, the Chapter 7
a Pennsylvania limited liability company            Trustee of FINISH ROBOTICS, INC.,

By: PREMIER AUTOMATION
    HOLDINGS, INC., its sole member


    By:_____      By:_____
        Michael F. Gunniers, President           Crystal H. Thornton-Illar, Chapter 7
                                                 Trustee of Finish Robotics, Inc.

4925-8292-3052, v. 3